# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DAVID DESCHOOLMEESTER, ET AL.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 10-1538** |
| | * | |
| **CARTUS CORPORATION, ET AL.** | * | **SECTION "L" (1)** |

## ORDER & REASONS

The Court has pending before it Cartus's renewed motion for summary judgment. (Rec. Doc. 67). The Court has reviewed the briefs and the applicable law and now issues this Order and Reasons.

## I.      BACKGROUND

This case arises out of Plaintiff David DeSchoolmeester's relocation from Florida to Louisiana to take a different position with the United States Department of Veterans Affairs ("VA"). Plaintiff formerly lived in Miami, Florida, where he owned a home with his wife.[1] Plaintiff worked at a VA Hospital. On January 28, 2008, the VA advertised a job position in New Orleans, Louisiana. The advertisement indicated that the job offer included "Home Sale Assistance." Pursuant to federal law, agencies "may enter into contracts to provide relocation services to agencies and employees," including "arranging for the purchase of a transferred employee's residence." 5 U.S.C. § 5724c. However, pursuant to regulations, an employee cannot be reimbursed for losses caused by real estate market conditions. *See* 41 C.F.R. § 302-11.304.

---

[1] Ms. Dick is a named co-Plaintiff in this case. Because Mr. Deschoolmeester's actions underlie the case, the Court will refer to him as Plaintiff in the singular.

Plaintiff applied, interviewed, and was offered the position in March, 2008. At some point the VA allegedly provided Plaintiff with an "Employee Relocation Policy Guide for Permanent Change of Station Home Owners" ("the Policy Guide"). Plaintiff reviewed the Guide and accepted the job offer. Plaintiff purchased a home in Mandeville, Louisiana, on April 30, 2008, while he still owned the Florida home. Plaintiff's wife left her job in Florida and moved to Louisiana in May, 2008.

After purchasing the Mandeville home and moving to Louisiana, Plaintiff contacted Defendant Cartus Corporation ("Cartus")[2], the corporation with which the VA had contracted to provide home sale assistance. The VA and Cartus were parties to Contract No. V101 (93) P-2173, pursuant to which Cartus would provide Home Sale Assistance, among other functions. The contract contained a number of descriptions of Cartus's responsibilities, including the following:

> The contractor [Cartus] shall provide all resources necessary to accomplishes the deliverables described in this SOW [statement of work], except as may otherwise be specified. The contractor shall provide a relocation services program that provides a minimum of:
> (1) pre-transfer counseling;
> **(2) home marketing assistance;**
> **(3) guaranteed home sale;**
> (4) property management services;
> (5) designation services to include homefinding for buyers and renters and mortgage finding assistance;
> (6) assistance with finding temporary quarters; and
> (7) upon the employee's request, the contractor shall also make a spouse employment counseling service available at the employee's expense.

(Rec. Doc. 67-2 at 8-9) (emphasis added). The Contract set out how Home Marketing Assistance and Guaranteed Sale were intended to function:

---

[2]Cartus changed its name after discontinuing its contract with the VA; at the time in question, it operated as Cendant Mobility.

> The Contractor shall provide assistance to a transferee who wishes to sell his/her home at the old duty station. .... The property must be marketed/listed with a broker registered with the Contractor in conjunction with the program participation for a minimum of sixty (60) calendar days prior to the transferee's acceptance of the Contractor guaranteed offer. The list price of the transferee's home must be within 8% of the Brokers Market Analysis (BMA).

(Rec. Doc. 67-2 at 12). Cartus was to provide the transferee with a marketing assistance contact which would assist the transferee with listing his or her residence for sale, and a list of appraisers from which the transferee would choose two appraisers to appraise the value of the residence. After those appraisers provided Cartus with two market-value appraisals of the residence, Cartus was to make a guaranteed offer to purchase the residence based on the average of those appraised values. After the guaranteed offer was made, the transferee could accept the offer within sixty days, provided that the transferee had also listed the property for sale for at least sixty days before accepting the guaranteed offer from Cartus. The terms of the Contract address what should happen if the guaranteed offer is for less than the amount of the mortgage on the house;

> In those cases where the amount of the guaranteed offer will be less than the mortgage balance, the Contractor will notify the RSC and COTR by telephone the same day the offer is made to the transferee. The Contractor will also mail the RSC a copy of the contract of sale, copies of the appraisal reports, and other necessary documentation on the same day the offer is made in these cases.

*Id.* at 33 (Rec. Doc. 67-2 at 19).

The Cartus/VA Contract allows Cartus to extend the sixty day period to accept the guaranteed offer of sale for an additional thirty days: "With the COTR's approval, the Contractor *may* extend the offer period for up to 30 calendar days to accommodate additional marketing time or the personal needs of the transferee." *Id.* at 35 (Rec. Doc. 67-2 at 21) (emphasis added).

Pursuant to Cartus's instructions, Plaintiff listed his Florida home for sale on March 28,

3

2008. After keeping the home on the market for 60 days, Cartus sent Plaintiff a guaranteed offer in the form of an unsigned Contract of Sale dated May 19, 2008. The Contract of Sale contained a guaranteed offer to purchase the property for $150,000, an amount based on the required appraisals. The unsigned Contract of Sale expressly stated that the offer would expire sixty days later, on July 18, 2008. It also set forth how and when it would become binding on the parties, and the requirements for Plaintiff to complete:

> 2. ACCEPTANCE AND CONTINGENCIES. (a) The Buyer's offer to buy your Home will expire on the date set forth above. Cartus must receive two copies of this Contract, signed and acknowledged by you ... on or before the date set forth above [July 18, 2008]. This Contract will be binding on you on the date of receipt by Cartus; **but it will be countersigned, dated and binding on the Buyer and Cartus only when all other required information and documents are received by Cartus ... and approved by Cartus.** Cartus will forward to you one fully-executed original of this Contract after the Buyer countersigns and dates this Contract.
> (b) This Contract and the obligations of Cartus ... are hereunder contingent upon and subject to Cartus receiving all information and documents requested of you and the following additional terms, conditions, information and/or documents if any:
> clear title, **positive net equity**

Ex. B at 6 (Rec. Doc. 67-3 at 1) (emphasis added). At all relevant times Plaintiff owed over $209,000 on his mortgage. He never had positive net equity in the property.

Plaintiff signed the Contract of Sale and returned it to Cartus approximately one week after receiving it. In the two months before the guaranteed offer expired, Plaintiff worked strenuously to arrange a short sale with his bank that would reduce the amount he owed on his mortgage to the amount of Cartus's guaranteed offer so that he could fulfill the requirement of positive net equity. One issue that postponed the short sale was the Bank's insistence on an "HUD-1" form. It is not clear that the form was actually required or that Cartus was required or authorized to produce one, but Cartus did not provide the form. By July 18, 2008, Plaintiff had

4

not successfully negotiated a short sale of the Florida home with his bank. Plaintiff requested that Cartus give him additional time to finalize the short sale; Cartus did not grant an extension. Accordingly, Cartus did not countersign the Contract of Sale or purchase the Florida home, which was subsequently foreclosed upon. Although the home was foreclosed upon, the bank relieved Plaintiff of any deficiency liability for the excess left on the mortgage.

Plaintiff contends that Cartus was about to terminate its contract with the VA because Cartus was losing money; that after Cartus made the $150,000 guaranteed offer, it received additional appraisals of the home indicating it was worth less than that; and that if Plaintiff managed to achieve positive net equity in the home through a short sale, Cartus would have lost money by paying $150,000 for a house worth less than that. Therefore, Plaintiff contends, Cartus acted in bad faith by refusing to grant Plaintiff an extension for Cartus's own financial benefit.

Plaintiff filed suit in this Court against the United States and Cartus, alleging that their conduct resulted in the foreclosure of the Florida home, ruined his credit, and caused him severe stress necessitating a transfer to a lower-paying, lower-stress job. The Court later granted the United States's motion to dismiss for lack of jurisdiction on the basis of sovereign immunity.

## II. PRESENT MOTION

Cartus now files a renewed motion for summary judgment on Plaintiff's claims. It contends that Plaintiff did not meet the conditions to receive assistance and that Cartus complied with all of its express contractual duties with respect to Plaintiff; accordingly, as a matter of law there is no breach of contract or breach of a duty of good faith and fair dealing. Cartus also argues that even if there was a breach, Plaintiff has suffered no recoverable damages because

5

Plaintiff was released from a deficiency judgment after the Florida home was foreclosed on and because emotional distress damages are not recoverable on this contract claim.

In response, Plaintiff argues that Cartus breached the Contract of Sale by insisting that Plaintiff have positive net equity prior to the expiration of the contract to purchase, when the Contract arguably allows Plaintiff to obtain net equity at a later date. Plaintiff also argues that Cartus breached the covenant of good faith and fair dealing by refusing in bad faith to extend Plaintiff's time to accept the offer because Cartus suspected it would lose money on the property. Plaintiff also responds that he has suffered damages as a result of Cartus's breach, and that emotional distress damages are available because Cartus breached its obligations in bad faith.

## II.  Law & Analysis

### A.  Summary Judgment Standard

A district court can grant a motion for summary judgment only when the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [and a] fact [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of

material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (internal citations omitted).

**B.     Breach of a Contract or Breach of the Covenant of Good Faith and Fair Dealing**

Plaintiff's claims must arise either from his status as a third-party beneficiary of the Cartus/VA Contract or from the May 19, 2008 guaranteed offer to purchase the Florida property.³ In opposition to summary judgment, Plaintiff articulates two theories: that Cartus breached the terms of the Contract of Sale by insisting that Plaintiff have positive net equity by July 18, 2008, and that Cartus breached the implied covenant of good faith and fair dealing by declining to grant Plaintiff a thirty-day extension of the July 18, 2008 deadline.

**1)          Breach of Contract**

As described above, the unsigned Contract of Sale dated May 19, 2008, was a proposed guaranteed offer to purchase Plaintiff's Florida property that, by its plain language, expired on July 18, 2008. The Contract of Sale also states that it is not binding on Cartus until Cartus countersigns "when all other required information and documents are received by Cartus ... and approved by Cartus" and that "[t]his Contract and the obligations of Cartus ... hereunder are

---

³The parties assume for the purpose of the motion that Plaintiff is a third-party beneficiary of the Cartus-VA contract. "The right of an intended, third party beneficiary to sue under a contract is recognized only if the parties clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party." *Hirshenson v. Spaccio*, 800 So.2d 670, 673 (Fla. App. 2001). The parties also assume that Florida contract law applies.

7

***contingent upon and subject to*** Cartus receiving all information and documents requested of you and the following additional terms, conditions, information, and/or documents [including] ***positive net equity***." It is undisputed that Plaintiff never had positive net equity in the Florida property and that Cartus never signed the Contract of Sale. Accordingly, there was no completed agreement between the parties for Cartus to purchase the Florida property, and Plaintiff cannot sue for a breach of a contract that was not completed.

However, the "Contract of Sale" did not exist in a vacuum. That document was the manifestation of Cartus's obligation, pursuant to its contract with the VA, to make guaranteed offers to purchase the homes of qualified relocating VA employees. Thus, although Cartus was never bound to purchase the property because it never countersigned the Contract of Sale, Cartus was bound in another sense: it was bound to keep the offer open for Plaintiff to accept within sixty days. If Cartus had discretion to reject an otherwise qualified home sale assistance candidate, then the offer would not be guaranteed and Cartus would not be in compliance with its contract with the VA. Accordingly, the Contract of Sale is some species of irrevocable offer, and Cartus did have some obligations even without countersigning, provided all the contingencies were timely satisfied by the Plaintiff.

It is that precursor obligation, to keep the offer open for Plaintiff to accept within sixty days, that Plaintiff alleges was breached. He argues that he successfully accepted the offer and the $150,000 sale price by signing and returning the Contract of Sale before July 18, 2008. Plaintiff argues that the positive net equity requirement is not tied to the expiration date, and that his successful acceptance meant that after he obtained positive net equity by arranging a short sale with his bank at some later date, Cartus would then have been obligated to fulfill its end of

the guaranteed offer and countersign. Plaintiff argues that Cartus had no contractual basis for insisting that the July 18, 2008 expiration date applied both to returning the signed form as well as having positive net equity, and therefore Cartus breached the Contract of Sale by ending cooperation with him after July 18. Essentially, Plaintiff argues that the parties would have reached a mutually-binding agreement for the sale of the property if Cartus had not improperly cut off the process too soon.

The issue is what Plaintiff had to do to accept the guaranteed offer and when he had to do it. The Court looks to the plain language of the document, which states:

> The Buyer's offer to buy your Home will expire on the date set forth above [July 18, 2008]. Cartus must receive two copies of this Contract, signed and acknowledged by you (and your spouse and/or other owners of your Home), on or before the date set forth above. This Contract will be binding on you on the date of receipt by Cartus; but it will be countersigned, dated, and binding on the Buyer and Cartus only when all other required information and documents are received by Cartus (or its representative, as appropriate) and approved by Cartus. Cartus will forward to you one fully-executed original of this Contract after the Buyer countersigns and dates this Contract.

(Rec. Doc. 67-3 at 1). The contract states that the offer expires on July 18, 2008, and the very next sentence states that Cartus must receive signed copies on or before that date. Receipt of the signed contract is the only event expressly tied to July 18. The contract does not expressly require that Cartus countersign before July 18 as well, nor does it expressly . Thus, Plaintiff's argument finds support in the plain language of the contract.

Moreover, the very next section suggests that Cartus, as drafter of the contract, was able to clearly express when certain conditions must be met before the sixty-day acceptance period expired:

> (c) If your Home is leased or occupied by tenants, you cannot accept the Buyer's offer until any lease agreement is terminated and the tenants have vacated the

9

> Home. If the lease has not been terminated and the Home not vacated by the
> tenants within the 60-day acceptance period, the offer shall be considered rejected
> by you.

*Id.* This is a clear example of a condition that Plaintiff had to satisfy before the expiration date and before he could accept the offer. The existence of positive net equity is not so expressly linked to the expiration date.

On the other hand, the contract unambiguously states that it "and the obligations of Cartus and the Buyer hereunder are ***contingent upon and subject to*** ... the following additional terms, conditions, information, and /or documents, if any: ... ***positive net equity***." *Id.* (emphasis added). It is troubling to read the contract to mean that Plaintiff could accept the offer before July 18, 2008 without having positive net equity, and thereby bind Cartus to wait for an indeterminate period for him to secure positive net equity  No other deadline for obtaining positive net equity seems to exist, and Cartus would be stuck in some sort of limbo, uncertain whether Plaintiff would ever obtain positive net equity such that it would be required to countersign the Contract of Sale. At oral argument, Plaintiff suggested that he should have had the opportunity to finalize a short sale and obtain positive net equity by the Possession Date. But the Possession Date is defined by the Contract of Sale as "within forty-five (45) days after the date the Buyer [Cartus] signs this Contract." (Rec. Doc. 67-3 at 2). There could be no Possession Date until after Cartus signed the Contract of Sale, and Cartus was not obligated to sign the Contract of Sale until Plaintiff had positive net equity. If July 18, 2008, was not the deadline for Plaintiff having positive net equity, then there was no deadline at all, other than some implicit limit of reasonableness.

Under Florida law, contractual language is ambiguous "when it is uncertain in meaning

and may be fairly understood in more ways than one and is susceptible of interpretation in opposite ways." *Barnett v. Destiny Owners Ass'n*, 856 So. 2d 1090, 1092 (Fla. App. 2003) (citation omitted). If a contract is ambiguous, a court may receive extrinsic evidence or "consider circumstances surrounding the parties at the time the contract was made." *See Arriaga v. Fl. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1247 (11th Cir. 2002). If ambiguity persists after applying those rules, then as a last resort "an ambiguous term is to be construed against the drafter." *See id.*

"The initial determination of whether the contract term is ambiguous is a question of law for the court, and, if the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law." *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. Dist. Ct. App. 2001). "However, where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." *Id.* (quotation omitted).

As explained above, the Contract of Sale, interpreted as a guaranteed offer rather than a completed agreement for the sale of property, is subject to two opposite interpretations. On the one hand, the contract does not expressly require that Plaintiff have positive net equity by July 18, 2008; on the other hand, the contract does not express any other deadline for Plaintiff to demonstrate positive net equity after returning a signed copy of the contract. Neither interpretation is entirely satisfactory. Pursuant to Florida law, under these circumstances the proper interpretation of the ambiguous contract is a factual question for the jury regarding the intent of the parties. If the jury agrees with Plaintiff's interpretation, the result is not necessarily

that Cartus was directly bound to purchase the property for $150,000; rather, Plaintiff must still show that he would have satisfied all the requirements of the Contract of Sale within a reasonable time after July 18, 2008, including obtaining positive net equity, such that Cartus *would have* counter-signed the Contract of Sale.

### 2) Breach of the Duty of Good Faith and Fair Dealing

Plaintiff also argues that summary judgment is inappropriate on the question of whether Cartus breached the covenant of good faith and fair dealing. Florida law implies a covenant of good faith and fair dealing in every contract. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001). "A party's good-faith cooperation is an implied condition precedent to performance of a contract; where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing himself of his own wrong doing." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999). However, the implied covenant of good faith and fair dealing "cannot override an express contractual term." *Haire Ford, Inc.*, 260 F.3d at 1291. "Rather than serving as an independent term within a contract, the implied covenant attaches to the performance of a specific contractual obligation." *Id.* (quotation and alteration omitted).

Cartus argues that there is no provision in either the Cartus/VA contract or the guaranteed offer that requires it to cooperate with transferees to create positive net equity, and that the provision of the Cartus-VA allowing it to request an extension of the expiration date on a guaranteed offer is entirely discretionary. In the absence of an express provision that it did not comply with, Cartus argues that Plaintiff cannot use the covenant to add new terms to the contract, such as a requirement that Cartus grant the extension.

12

Plaintiff makes two arguments in response. First, Plaintiff argues that Cartus was in bad faith by insisting that the contract required positive net equity by the expiration date. This argument is redundant of the breach of contract argument addressed above. Either the Contract of Sale did or did not require positive net equity before Plaintiff could accept the offer; if it did, then Cartus did not breach any duty of good faith by complying with the terms of the contract, and if it did not, then Plaintiff does not need the good faith theory.

Second, Plaintiff argues that Cartus acted in bad faith by refusing to request an extension as provided for in the Cartus/VA contract. Plaintiff agues that Cartus had obtained subsequent appraisals indicating that the property was worth less than the $150,000 guaranteed offer it had issued, and that it refused to grant an extension to allow Plaintiff to arrange a short sale with his bank at that price because Cartus would lose money on the transaction. Therefore, Plaintiff argues that the improper motivation caused it to withhold an extension in bad faith.*[4]*

Plaintiff cites *Coppola Enterprises, Inc. v. Alfone*, 531 So. 2d 334 (Fla. 1988). In *Alfone*, the plaintiff agreed to purchase a house from the defendant builder, with closing to occur ten days after written notice from the builder. *Id.* at 335. Over a year past the projected closing date, the builder sent the contractually-required ten days notice and the plaintiff asked for additional time to secure financing to pay the balance due on the contract. *Id.* The builder refused to grant an extension and sold the property to a different buyer at a higher price than provided for in the original contract. *Id.* The plaintiff sued and won on a theory that the builder acted in bad faith by refusing to grant a reasonable extension. The Florida Supreme Court

---

[4]If the jury finds that the July 18, 2008 deadline applied only to returning the signed Contract of Sale and not actual existence of positive net equity, then no extension would have been necessary and this alternative argument is moot.

affirmed, holding that the plaintiff "was entitled to a reasonable time in which to acquire the funds to pay the balance due on the property." *See id.* at 335; *cf. Seabreeze Restaurant, Inc. v. Paumgardhen*, 639 So. 2d 69, 71 (Fla. App. 1994) (acknowledging that implied duty of good faith and fair dealing may require seller of property to grant reasonable extension of time to close, but concluding that "time is of the essence clause" defeated the implied duty). However, in *Alfone* and *Seabreeze*, the parties had entered into a binding agreement for the sale of property. Here, Plaintiff at most had a guaranteed offer with a time limit.

By the terms of the Cartus/VA contract, Cartus had discretion to request a thirty-day extension from the VA or not to request an extension. It had no contractual duty to do so. The Court will not apply the covenant of good faith and fair dealing to bootstrap a purely discretionary action into a mandatory one. The motion for summary judgment is granted as to that theory.

**B.       Damages**

Cartus argues that summary judgment is appropriate because Plaintiff cannot recover any damages from any purported breach of contract or duty. The parties dispute whether Plaintiff incurred any monetary losses from Cartus's breach, and whether Plaintiff can recover emotional distress damages.

**1)       Contract Damages**

Under Florida law, "[d]amages are awarded in a breach of contract action as an attempt to place the injured party in the position he or she would have occupied had the contract been performed. To be recoverable, such damages must arise naturally from the breach, or have been in contemplation of both parties at the time they made the contract, as the probable result of a

breach." *Hobbley v. Sears Roebuck & Co.*, 450 So. 2d 332, 333 (Fla. App. 1984).

Cartus submits that after the bank foreclosed on the Florida home, Plaintiff was released from any deficiency judgment for the negative equity in the home. Therefore, Plaintiff currently has no Florida house and owes no additional amount on the mortgage on that house, and is in no worse position than if he had arranged a short sale with his bank for the $150,000 offered by Cartus.

Plaintiff argues in response that he has suffered cognizable damages as a result of Cartus's failure to cooperate. Plaintiff does not articulate what his direct losses are with respect to the value of the house. Instead he argues that he was damaged because he was forced to make mortgage payments on both the house in Florida and the house in Louisiana; his credit rating has dropped; he was sued by his homeowners' association in Florida; his wife left a well-paying job in Florida to move to Louisiana; and that they would not have purchased a home in Louisiana and moved had they known that the Florida home would not be purchased pursuant to the VA home sale assistance program.

Cartus replies that none of those damages were reasonably foreseeable from its perspective at the time it issued the Contract of Sale. Rather, those were simply the consequences of the fact that Plaintiff accepted a job in Louisiana and purchased a second home before he sold his first home in Florida, and indeed even before he had contacted Cartus to attempt to arrange the sale of the Florida home.

The parties have not cited any apposite Florida authority addressing the foreseeability of these particular damages and whether under these circumstances the foreseeability is a question of law for the Court or a question of fact for the jury. Here, the guaranteed offer was for

purchase of a house. According to Plaintiff's theory, if Cartus had complied with the terms of the Contract Plaintiff would have had additional time to secure a short sale with his bank and sell the property to Cartus for $150,000 which would have relieved him of any excess owed on the mortgage. The eventual foreclosure on the property resulted in precisely the same outcome and therefore no damages are necessary to put Plaintiff in the same position had Cartus purchased the house. With respect to Plaintiff's other articulated damages, those are arguably the consequence of Plaintiff's relocation to Louisiana and voluntary assumption of a second mortgage. Evidence suggests that Plaintiff took those steps before he ever contacted Cartus, at a time when he was charged with knowledge of the federal regulations prohibiting him from being compensated through home sale assistance for real estate losses. *See* 41 C.F.R. § 302-11.304; *Wright v. Allstate Ins. Co.*, 415 F.3d 384, 388 (5th Cir. 2005) ("Where federal funds are implicated, the person seeking those funds is obligated to familiarize himself with the legal requirements for receipt of such funds."). However, the Court cannot say at this time that Plaintiff's alleged damages were so unforeseeable as to be unrecoverable as a matter of law. The question may be appropriate grist for the fact finder or a Rule 50 motion at trial.

    **2)**           **Emotional Distress Damages**

Under Florida law, emotional distress and mental anguish damages are generally not available except under two circumstances. First, the damages are available if they "may reasonably be held to have been within the contemplation of the parties, as a probable result of the breach, at the time of entering into the contract." *Bazal v. Belford Trucking Co.*, 442 F. Supp. 1089, 1100 (S.D. Fla. 1977); *see also Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1200 (11th Cir. 2007) ("Although the general rule is that emotional damages for breach of

16

contract will not lie, this rule is simply a shorthand way of saying that emotional distress is usually not a foreseeable consequence of breach.") (citation omitted). Second, they may be available if the defendant committed an independent willful tort. *Crenshaw v. Sarasota Cty. Public Hosp. Bd.*, 466 So. 2d 427, 429 (Fla. App. 1985); *see also Singleton v. Foreman*, 435 F.2d 962, 971 (5th Cir. 1970) (holding that "the acts constituting the breach [must] also amount to an independent tort" to recover damages for mental anguish); *Henry Morrison Flagler Museum v. Lee*, 268 So. 2d 434, 436-37 (Fla. App. 1972) ("[W]here the gravamen of the proceeding is Breach of contract, even if such breach be willful and flagrant, there can be no recovery for mental pain and anguish resulting from such breach.").

Cartus contends that mental anguish damages for future third-party beneficiaries were not reasonably contemplated when Cartus entered into its contract with the VA to provide Home Sale Assistance, nor were mental anguish damages contemplated when it made the guaranteed offer to purchase the Florida home. Additionally, it argues that there have been no allegations of conduct arising to the level of an independent tort, rather than simply application of arguably ambiguous contractual terms. Therefore, it argues that emotional distress damages are unavailable as a matter of Florida law. Plaintiff responds that the refusal to grant an extension was in bad faith breach of the terms of the contract and rises to the level of intentional tortious conduct, such that mental anguish damages are available.

This was a contract to purchase a house. Plaintiff has not cited any authority from Florida or elsewhere that mental anguish damages are reasonably contemplated in a contract for sale of a house or suggested that such consequences were conveyed to Cartus. Moreover, in light of the multiple plausible interpretations of the Contract of Sale and Cartus's express

discretion to request an extension under the VA/Cartus subcontract regarding extensions, Cartus's conduct in refusing to cooperate with Plaintiff to obtain positive net equity after the sixty-day acceptance window does not rise to the level of a willful and flagrant independent tort. Accordingly, mental anguish and emotional distress damages are unavailable as a matter of law.

### III. Conclusion

For the foregoing reasons, Cartus's motion for summary judgment is GRANTED IN PART and DENIED IN PART, as set forth above. Cartus's motion is GRANTED with respect to Plaintiff's claim for breach of the covenant of good faith and fair dealing and as to the availability of emotional distress or mental anguish damages, and DENIED with respect to the breach of contract claim and the availability of damages flowing from that breach of contract.

New Orleans, Louisiana this 23rd day of November, 2011.

_____
UNITED STATES DISTRICT JUDGE